No. 23-13456-D

---

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

**I.S., M.S., and J.S.,**

*Plaintiffs/Appellants*,

v.

**FULTON COUNTY SCHOOL DISTRICT,**

*Defendant/Appellee.*

---

Appeal from the United States District Court
for the Northern District of Georgia

No. 1:20-cv-02657-VMC

---

## APPELLANTS' OPENING BRIEF

---

Chris E. Vance
Chris E. Vance, P.C.
Suite 100
2415 Oak Grove Valley Road
Atlanta, Georgia  30345
(404) 320-6672

Counsel for Appellants

**No. 23-13456-D**
**I.S. v. Fulton County School District**

**Certificate of Interested Persons and**
**Corporate Disclosure Statement**

COME NOW Appellants I.S., M.S., and J.S. and file this Certificate of Interested Persons and Corporate Disclosure Statement, stating that the following is a complete list of the trial judge, all attorneys, and all persons or associations that have or may have an interest in the outcome of this appeal:

-Bell, MaryGrace

-Bray, Melody

-Calvert, Victoria

-Chris E. Vance, P.C.

-Fulton County School District

-Gupta, Neeru

-Moulard, Brandon

-Parker, Poe, Adams & Bernstein LLP

-S., I.

-S., J.

-S., M.

-Teate, Stephen

C-1 of 2

**No. 23-13456-D**
**I.S. v. Fulton County School District**

-Theriot, Jaime

-Vance, Chris

-Warco, Laurance

**Statement Regarding Oral Argument**

Appellants request oral argument as this Court has before it upon *de novo* review an extensive administrative record.  Appeals involving the rights of disabled children and their parents under the Individuals with Disabilities Act, such as this one, involve voluminous records and specialized legal issues.  In such cases, oral argument can aid in the decision making process and application of the evidence to the law.

**Table of Contents**

**Page**

Certificate of Interested Persons and Corporate Disclosure Statement …. C-1

Statement Regarding Oral Argument ……………………………………. i

Table of Contents ……………………………………………………ii

Table of Citations ……………………………………………………iv

Jurisdictional Statement ……………………………………………...vii

Statement of the Issues ……………………………………..…. 1

Statement of the Case ………………………………………………1

      Jurisdictional History ……………………………………………. 1

      Statement of the Facts ……………………………………… 3

      Statement of Standard of Review …………………………...16

Summary of the Argument …………………………………………...17

Argument ……………………………………………………19

      A/B. The District Court Erred in Finding FCSD
      Provided I.S. a FAPE  Procedurally and Refusing
      to Supplement the Record …………..………………………………23

      C.  The District Court Erred in Finding FCSD
        Provided I.S. a FAPE  Substantively…………………………… 40

      D.  The District Court Erred in Finding FCSD
        Provided I.S. an Education in the LRE …………………………45

Conclusion …………………………………………………………………46

Certificate of Compliance …………………………………………………48

Certificate of Service ………………………………………………………48

## Table of Citations

**Cases**                                                                 **Page(s)**

*Amanda J. v. Clark County School District,*

267 F.3d 877 (9th Cir. 2001)                                             24

*Board of Educ. of Hendrick Hudson Central*

*Sch. Dist. v. Rowley*, 458 U.S. 176 (1982)                              20, 44

*Brown v. Dist. of Columbia*, 179 F.Supp.3d 15 (D. D.C. 2016)            45

*Cory D. v. Burke Cnty. Sch. Dist.*, 285 F.3d 1294 (11th Cir. 2002)      17

*Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386 (11th Cir.  1994)     31

*Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840 (6th Cir. 2004)     27

*Endrew F. v. Douglas Cnty. Sch. Dist.*, 137 S.Ct. 988 (2017)            40, 41

*Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7 (1993)            44-45

*Georgia Assoc. of Retarded Citizens v. McDaniel*,

716 F.2d 1565 (11th Cir.), *cert. denied*, 469 U.S. 1228 (1983)          24

*Grand Jury Proceedings 99-9*, 889 F.2d 1039 (11th Cir. 1990)            17

*Hall v. Vance Cnty. Bd. of Educ.*, 774 F.2d 629 (4th Cir. 1985)         40-41

*Honing v. Doe*, 484 U.S. 305 (1988)                                     24

*In re Grand Jury (G.J. No. 87-03-A)*, 845 F.2d 896 (11th Cir. 1988)     17

*In re Grand Jury Subpoena*, 2 F.4th 1339 (11th Cir. 2021)               34

*JSK v. Hendry County Sch. Bd.*, 941 F.2d 1563 (11th Cir. 1991)    23

*K.D. v. Dep't of Educ.*, 665 F.3d 1110 (6th Cir. 2011)    28

*Lorenz v. Valley Forge Ins. Co.*, 815 F.2d 1095 (7th Cir. 1987)    32

*M.C. v. Antelope Valley Union High Sch. Dist.*,

858 F.3d 1189 (9th Cir. 2017)    23, 26

*Muscogee Cnty. Sch. Dist.*, 668 F.3d 1258 (11th Cir. 2012)    17

*R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003 (5th Cir. 2010)    40

*R.L. v. Miami-Dade Cnty. Sch. Bd.*,

757 F.3d 1173, 1181 (11th Cir. 2014)    16, 17, 45

*R.L. v. Miami-Dade Cnty. Sch. Bd.*, 2008 WL 3833414

(S.D. Fl. Aug. 12, 2008), *aff'd*, *R.L.* 757 F.3d at 1193    28-29

*Spielberg v. Henrico Cnty Pub. Schs.*, 853 F.2d 256 (4th Cir. 1988)    29

*Union Sch. Dist. v. Smith*, 15 F.3d 1519 (9th Cir. 1994)    44

*U.S v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991)    32

*W.G. v. Board of Trustees of Target Range Sch. Dist. No. 23*,

960 F.2d 1479 (9th Cir. 1992)    27

*Winkelman v. Parma City Sch. Dist.,* 550 U.S. 516 (2007)    40

**Statutes**

20 U.S.C. § 1414(d)    44

v

20 U.S.C. § 1400(d)(1)(A)                                    19

20 U.S.C. § 1400(d)(1)(B)                                    19

20 U.S.C. § 1401(26)(A)                                      40

20 U.S.C. § 1412(a)(5)                                       20

20 U.S.C. § 1414(d)                                          44

20 U.S.C. § 1414(d)(1)                                       25

1414(d)(1)(A)(i)(II)(aa)                                     48

1414(d)(1)(A)(i)(II)(bb)                                     48

20 U.S.C. § 1414(d)(1)(B)                                    24

20 U.S.C. S 1414(d)(3)                                       25

20 U.S.C. § 1414(d)(3)(A)(iii)                               36

20 U.S.C. § 1414(d)(4)                                       24, 25

20 U.S.C. § 1415(b)                                          24

20 U.S.C. § 1415(b)(3)                                       37

20 U.S.C. § 1415(c)                                          37

20 U.S.C. § (d)(2)                                           24

20 U.S.C. § (f)(3)(E)                                        24, 37

20 U.S.C. § 1415(f)(3)(E)(ii)                                23

vi

**Regulations**

34 C.F.R. § 300.9(a) ............................................................ 23

34 C.F.R. § 300.34(c)

34 C.F.R. 300.115(a) ............................................................ 28

34 C.F.R. 300.115(b)(1) ........................................................ 28

34 C.F.R. 300.116(a)(1) ........................................................ 27

34 C.F.R. § 300.116(b)(2) ...................................................... 28

34 C.F.R. § 300.116(d) .......................................................... 45

34 C.F.R. § 300.613(a) ........................................................ 24, 39

**Jurisdictional Statement**

The district court had jurisdiction of the case that is docketed as No. 23-13456 pursuant to 20 U.S.C. § 1415(i)(2)(A) granting authority to the district court to review *de novo* administrative final decisions rendered pursuant to the Individuals with Disabilities Education Act.  The Court of Appeals has jurisdiction of this appeal pursuant to 28 U.S.C. § 1291.

**Statement of the Issues**

A.    Whether upon *de novo* review, the district court erred in finding appellant procedurally provided a free appropriate public education ("FAPE) to I.S. pursuant to the Individuals with Disabilities Education Act ("IDEA").

B.    Whether the district court abused its discretion in not allowing appellants to supplement the administrative record with relevant evidence.

C.    Whether upon *de novo* review, the district court erred in finding appellant substantively provided a FAPE to I.S. pursuant to the IDEA.

D.    Whether upon *de novo* review, the district court erred in finding appellee provided I.S. a FAPE in the least restrictive environment ("LRE").

**Statement of the Case**

**Judicial History** – On January 10, 2019, appellants requested a due process hearing pursuant to the IDEA. Doc 40-1 at 23-36.  On March 27, 2019, the administrative law judge ("ALJ") ruled without explanation that, *inter alia*, a recorded conversation wherein two Fulton County School District ("FCSD") administrators and a FCSD attorney told a school psychologist what to add and delete from her psychological recommendations contained her evaluation report of I.S. was an attorney-client communication and thus privileged.  Doc 40-4 at 377-381. The hearing began on August 5, 2019, and after the hearing began, only then did FCSD and its behavior

analyst ("BCBA") provide educational records requested by appellants for over a year.  Doc 115-4 at 24-42.  Once M.S. received the records and learned his son I.S. and he had a right of confidentiality, M.S. invoked that right.  Doc 115-4 at 24-42. The ALJ postponed the hearing upon motion by FCSD, and on September 20, 2029, the ALJ ruled that M.S. and I.S. had waived their unknown right to invoke confidentiality with the BCBA.  Doc 59-5 at 287-289.[1]  The ALJ did not resume the hearing until December 18, 2019 and thereafter entered a final decision on March 26, 2020.  Doc 40-9 at 112-167.  Appellants appealed the ALJ's decision to the district court on June 23, 2020.  Doc 1.  The case was first assigned to Judge Thrash, then to Judge May, who struck appellant's original complaint and required appellants to re-file their complaint under seal (Doc 30), granted in part appellants' motion for discovery (Doc 60), and granted in part appellants' motion to supplement the IDEA administrative record (Doc 90).  Without deciding whether school administrators and an attorney pressuring a school psychologist to add and delete psychological recommendations for I.S. was legal advice or not and without considering if such action was fraudulent, Judge May ruled FCSD had waived any right to assert that portion of the recorded conversation privileged, even if in fact it was privileged.  Doc 90 at 10-13.  After the parties filed motions for reconsideration, the case was

---

[1] Despite I.S.'s educational records informing M.S. he had a right of confidentiality being withheld in violation of his IDEA procedural rights, the ALJ ruled M.S. and his counsel should have known that right and should have made reasonable inquiry.

transferred to Judge Calvert on April 11, 2022. Judge Calvert granted FCSD's motion for reconsideration. Doc 107.[2] Judge Calvert granted FCSD's motion for judgment on the record, denying appellants' motion, and entered judgment for FCSD on September 29, 2023. Docs 120, 121. Appellants filed a notice of appeal on October 17, 2023. Doc 123.

**Statement of the Facts** - I.S. is a cognitively gifted young man who has clinically significant autism, depression, and severe anxiety, social anxiety, and social skills impairment. Docs 40-3 at 361, 377; 40-4 at 554-555; 40-5 at 26-27, 212; 40-6 at 26. Despite I.S.' superior intellectual skills, his disabilities result in severe impairments in functioning across all settings. *Id.* As of September 2016, I.S. spoke in a low tone, did not initiate communication with others, and would respond by nodding his head. Doc 59-5 at 737. During his education in the FCSD, from middle school forward, I.S. could sometimes access education in a small private school setting such as Eaton Academy ("Eaton"). Doc 40-5 at 127-128, 154, 178-179, 180, 417, 432, 464-465. At times, however, due to I.S.'s debilitating anxiety, autism, and depression, I.S. required a residential therapeutic educational placement in order to access education and his Individualized Education Program ("IEP"). *Id.* at 131-132, 152-153, 154, 155. This was widely known, so much so that when the parties

---

[2] Judge Calvert disagreed with Judge May's legal analysis and found FCSD's discussion regarding I.S. psychological evaluation involved "the treatment of behavioral disorders" and ruled such to be legal advice. Doc 107 at 18-19, n.4.

reached a prior settlement, they agreed to place I.S. at Eaton, with the express agreement that if I.S. experienced a change in functioning that would warrant a change in placement or services under his IEP, the parties would conduct an IEP meeting to address I.S.'s change in functioning and needs. *Id.* at 417, 432; Doc 40-8 at 9-11. I.S. was able to access education and services from January to May 2016 at Eaton. Doc 40-5 at 156. However, when I.S. started 11th grade, by the second week of school in August 2016, I.S.'s anxiety and depression increased to the point where he could not access Eaton, despite Eaton attempting multiple approaches to accommodate I.S.' needs. Docs 40-5 at 134-135, 137, 152, 165-166, 190, 441-444; 40-8 at 400, 402. Because of I.S.' change in functioning, I.S.' parents notified FCSD and requested an IEP meeting. Docs 40-5 at 441, 444-446; 40-7 at 113-115. An IEP meeting was held on September 26, 2016. When M.S. asked what the plan was if they could not get I.S. back to school and a residential placement were needed. Doc 42, P-6, 16:55. FCSD's special education director, Gilland, replied that an evaluation and more information was needed. *Id.* Docs 42, P-6, 9/26/2017,16:55; 25:05; 40-8 at 281-283 (It was I.S.'s parents understanding that changing I.S.' IEP was put on hold by Gilland until FCSD conducted a psychological evaluation, yet at the same time Gilland said FCSD would hold off on the evaluation until I.S. was more stable.

Doc 42, P-6, 9/26/2017, 33:55[3]).  M.S. shared his concern with waiting for an evaluation if I.S. could not attend school and required a residential placement.  *Id.* at 6:30; 15:55, 16:12.  At this meeting, M.S. explained that it was critical to get I.S. back in school (even with virtual in the Eaton mentor room) but not virtual at home, as that would not work.  *Id.*; *id.* at 18:55.  M.S. explained that if they could not accomplish getting I.S. back to school without delay, they were going to have to consider and research a residential placement.  *Id.* at 6:30, 16:29, 32:05 (M.S. did not want a residential placement but said if it was necessary, then it was necessary and delay was not appropriate. (This approach had worked in the past. Doc 40-5 at 448-449.)).  FCSD offered to have its BCBA observe I.S., but there were no set hours or explanation of services to be provided.  Docs 40-5 at 314; 40-7 at 59.  At the IEP meeting, FCSD did not review I.S.'s IEP or provide appellants the IDEA IEP process despite I.S.' change in functioning and resulting need for additional services and supports.  Docs 40-6 at 3-39; 42, P-6, 9/26/2016.  At the meeting, Gilland asked if I.S. did not return, how long did they need to wait for FCSD to provide at some future time services in the home to support virtual, but FCSD did not put that in I.S.'s IEP.  Doc 42, P-6, 9/26/2026, 16:53-19:15; 40:25-44.  J.S. responded that she did not find I.S. needed academic instruction and did not know if that would be

---

[3] Doc 42, P-6 is appellant's exhibit introduced into the administrative record and includes audio recordings of IEP meetings.  Time is given to direct the Court to the portion of the recording where the conversation begins.

beneficial or not, and M.S. replied that home placement is not a goal for I.S. because I.S. required socialization. *Id.* At the hearing, Gilland alleged that FCSD offered teacher services in the home in September 2016, so the ALJ and district court adopted this fact which the recording disproved. [4] *Id.*; Docs 120 at 9; 40-9 at 117-118. Two days after the meeting, Gilland sent an email to I.S.'s parents saying the BCBA was going to conduct a functional behavior assessment ("FBA") and prepare a behavior intervention plan ("BIP") and FCSD was going to conduct a psychological evaluation, and M.S. executed FCSD's consent forms and returned them without delay. Docs 40-5 at 451; 40-7 at 112, 125-127. The first time M.S. was told that FCSD had decided not to conduct an FBA and provide a BIP was at the hearing in August 2019. Doc 40-5 at 567.

A second IEP meeting was conducted on November 11, 2016. Doc 40-5 at 136-137. At this meeting, the director of Eaton informed I.S.' IEP team members that I.S. had not been able to access Eaton and had made no progress since the last IEP meeting. *Id.* at 149. Despite this, FCSD did not review I.S.' IEP but instead said, without inclusion in I.S.' IEP, its BCBA was to provide I.S. 3 hours a week of support. Docs 40-5 at 855; 40-7 at 59. *As of this meeting, the behaviorist had only*

---

[4] Gilland did not "offer" to put in I.S.' IEP or even provide I.S. at that time a teacher coming to the home to assist I.S. completing a virtual program at home. Doc 42, P-6, 9/26/2016, 16:53-19:15, 40:20-44:00. Instead, Gilland was discussing FCSD's plan sometime in the future if I.S. could not access school. *Id.*

*met with I.S. 3 times in almost 2 months*. Doc 42, P-6, 11/11/2016, 2:40. Despite FCSD claiming and the ALJ adopting the false claim that J.S. said the BCBA's "plan" was the "best plan [she had] heard so far," that was not what J.S. said. Instead, the BCBA said if the goal is to get I.S. back to school, then they should focus on things that interest I.S. at Eaton. J.S. replied, "that is the best idea I've heard so far." *Id.* At this meeting, M.S. said once again they had to work quickly and come up with a plan and get a schedule in place, have obtainable goals, as well as have a backup or contingency plan if I.S. cannot meet those goals. *Id.* at 29:50. Gilland said everyone agrees I.S. does not need academic instruction but needs to be taught self-management skills, and I.S.'s uncle, a psychologist, said therapeutic assistance was needed. *Id.* at 21:23, 37:04. Gilland said the next steps included scheduling the 3 hours a week with the behaviorist, but this never happened, as FCSD and its behaviorist would never commit to a schedule. *Id.* at 1:00:03; Docs 40-5 at 206-207, 300-301, 304, 539-541, 543; 42, P-6, 11/11/2016, 58:00-1:00:11, 1:02:50-1:02:57, 2:19:56-2:20:29. When M.S. offered 11 to 1:30 each Monday, Wednesday, and Friday for I.S. and the behaviorist to meet, the behaviorist said she was not available as she had to go to numerous schools and had other scheduling conflicts. *Id.* When M.S. asked what the contingency plan was, Gilland responded they needed to meet again and put services in I.S.' IEP, not even discussing at the meeting, much less reviewing and revising as needed, I.S.' IEP. Doc 42, P-6, 1:03:57. On December

12, 2016, the BCBA for the first time accessed two Eaton virtual courses online, seeing I.S. had only completed 4 of 32 math lessons. Doc 40-5 at 309-310. A third IEP meeting was held on December 21, 2016, and FCSD's BCBA did not provide a written report. *Id.* at 336-337, 347. While FCSD once again did not review or amend I.S.'s IEP, its BCBA testified she was to provide I.S. 2 hours a week of services. Doc 40-7 at 59. At the meeting, M.S. and the Eaton representative both questioned placing I.S. on virtual. Doc 42, P-6, 12/21/2016, 8:19 (M.S. stated he was concerned with virtual at home and that I.S. needed socialization and interaction with others.), 58:24 (Eaton asked why was virtual (at home) chosen at all.). At the meeting, M.S. explained that getting I.S. back to Eaton would be a good option but added I.S. could not access Eaton mentally and physically. *Id.* at 42:55. M.S. explained he had researched and located an appropriate residential therapeutic placement, John Dewey Academy ("John Dewey"), and Gilland responded "we have an IEP in place for services at Eaton. I by no means am going to stop trying to do that …." *Id.* at 49:18-51, 52:00. A little later, Gilland stated, "we are not changing anything on [I.S.'] IEP." *Id.* at 54:33. M.S. explained that I.S. required "a lot of therapy" and "a structured environment," and without that placement, I.S. would not succeed. *Id.* at 1:01:15-1:03:01. Gilland's response was that an evaluation of I.S. "has to happen." *Id.* M.S. explained that the therapeutic residential school had rolling admission, and time was a concern. *Id.* at 1:07:00. Gilland replied that they "have an IEP at Eaton

right now," after having said she was not going to change I.S.' IEP. *Id*; *id.* at 1:09:16. As to providing a teacher in the home, unlike the ALJ and district court concluded upon FCSD assertion, Gilland did not offer to send a certified teacher to I.S.' home, but instead said she proposed a teacher coming to the home saying she would get back in writing with the family on that proposal and with options. *Id.* at 54:35, 1:05:00; Docs 49-9 at 125; 120 at 11-12. Gilland admitted she never got back to the family about a teacher. Doc 40-8 at 678-679. At the meeting, Gilland tried to blame J.S. regarding scheduling, and M.S. reminded Gilland it was FCSD that was supposed to provide a consistent schedule and never had, asking also for "a solid behavioral plan" (BIP) with supports. Doc 42, P-6, 12/21/2016, 43:35. FCSD **never** provided a schedule for its BCBA, an FBA, or BIP. Docs 40-5 at 204, 214, 235, 331, 657, 661.[5]

FCSD's BCBA provided her "Confidential Report" to I.S.'s parents on January 11, 2017. Docs 40-5 at 657; 40-7 at 1-8. This report was not an FBA or a BIP and the BCBA's "plan" mandated 9 visits just to try to get I.S. to Eaton for a

---

[5] FCSD and its BCBA refused to commit to a schedule yet secretly logged each time there was a scheduling conflict, blaming J.S. (who had to work) for this. Doc 40-5 at 29-39, 296, 303, 539. FCSD and its BCBA withheld these logs from appellants despite many requests for them and for all records involving I.S. *Id.* Instead of providing a schedule, Gilland told FCSD's behaviorist to "just keep documenting when J.S. can't make it." Doc 40-8 at 392.

mere 3 hours.  Doc 40-7 at 7.  This would require more than a month ***without any***
***scheduling issues*** just to try to get I.S. to school for only 3 hours.  *Id.*  This new
"plan" was found by I.S.' parents to be "wholly inappropriate," as it had no fall back
plan (just keep asking I.S. to go and keep reducing the task of only going to school
for 3 hours in 1.5 weeks).  Doc 40-5 at 544-546.  The BCBA's "plan" required I.S.
complete only 12 lessons in only 2 of 6 subjects at home in 9 weeks.  Doc 40-5 at
145, 150.  The alleged "plan" was to have I.S. go in the public and then ask I.S. to
go to Eaton.  Docs 40-5 at 349; 40-7 at 1-8.  I.S. was already going to public places
prior to the BCBA's limited involvement. Doc 40-8 at 720, 724.  In addition, I.S.
going to public places and doing assignments, *the past data showed*, did not get I.S.
back into a school environment where social interactions caused anxiety, as was
proved when I.S. was in middle school.  Doc 40-5 at 547-550.  The BCBA's "plan"
provided I.S. no social skills training, no social language instruction, no therapy, no
counseling services, and no parent training.  Docs 40-6 at 95; 40-7 at 7.  If the
behaviorist asked I.S. to go to Eaton and that did not work, the behaviorist would
observe what that looked like and make a new plan.  Doc 40-8 at 720.  For example,
I.S. might just be asked to go to the Eaton parking lot.  *Id.* at 724.  Before I.S. was
removed from FCSD and privately placed, the alleged "plan" was failing, as I.S. was
not able to set work completion goals and had only completed 2 lessons in 1 of 6

courses. *Id.* at 724-725. As of February 2017, FCSD's BCBA had never even once asked I.S. to attend Eaton. *Id.* at 727; Doc 40-5 at 333.

On January 16, 2017, I.S.'s parents gave formal written notice under the IDEA that they would be privately placing I.S. at public expense because I.S. was not being provided a FAPE. Docs 40-8 at 112; 40-5 at 255-256. In the notice, I.S.'s father requested an emergency IEP meeting to further discuss the matter. *Id.* On January 23, 2017, Barrow, the other FCSD administrator involved, sent an email to the school psychologist, telling her that "[t]he case has now gone legal," adding they had to have a meeting with the psychological report that week. Doc 40-7 at 104. During the January 25, 2017 telephone meeting, Gilland and a FCSD attorney pressured the psychologist to remove and add psychological recommendations from I.S.' evaluation report, directly telling the psychologist to add the psychological recommendation that I.S. should continue consultation with a behavior specialist. Docs 17-5 (public record) at 9; 40-4 at 112-113, 121 116, 128, 130, 147-149 (proffered); 73 (actual recording filed under seal). Directly after this call, Barrow emailed the psychologist her signed psychological report with marked up changes. Docs 40-5, pp. 369-370, 376; 40-7 at 18-40, 39 (after **RECOMMENDATIONS**, Barrow added, "you discussed this on the phone"), 107. Despite FCSD adamantly alleging only Candance Ford, a school psychologist, marked up the report, Ford testified at the hearing she was not the one who provided the comments regarding

changes to be made to psychological recommendations for I.S., and FCSD finally admitted during discovery it found Barrow had made the changes. Docs 59-31 at 189-211; 212-234; 69-4 at 1-2, 21; 86-1 at 241-42, 265. Barrow and Gilland denied under oath, in writing, and in formal IEP meetings having anything to do with any changes to I.S.' evaluation report, saying they were not qualified to do so and had no such involvement. Docs 34-3 at 94; 42, P-6, 8/25/2017, 78:00-82:50; 59-3 at 407-408; 59-5 at 165-168; 69-4 at 2; 93 at 19. The day following the call, FCSD presented to I.S.' parents orally its altered psychological evaluation report including the psychological recommendation the psychologist was pressured to add that I.S. would continue with behavior consultation services. Docs 42, P-6, 1/26/2017, 1:13; 59-4 at 611-612; 69-4 at 18 (Int. 4); 93 at 21. Gilland asserted FCSD requested the psychological evaluation "to assist in educational planning." Doc 40-9 at 118. *See also* Doc 40-8 at 346 (Gilland claimed FCSD needed a psychological evaluation of I.S. "to make really informed decisions."). When M.S. explained I.S. required a residential therapeutic school with social support, counseling, and group therapy, Gilland did not discuss that concern or placement with M.S. but responded FCSD wanted to continue with the behavioral support, saying that's where FCSD is. Doc 42, P-6, 1/26/2017, 2:09:25-2:10:59, 2:34:10-2:35:14. FCSD's BCBA followed up stating they had not asked I.S. to go to Eaton. *Id.* As of the January 26, 2017 IEP meeting, I.S. had made no educational progress that entire school year. Doc 40-5 at

131, 189-190, 192, 255-256, 596-597. I.S. had completed only 7 out of 72 lessons in only 2 of 6 high school courses in 5 months. Docs 32, ¶ 83; 40-5 at 732; 40-6 at 44; 69-5 at 6; 93 at 21. As to the January 2017 IEP meeting, only 3 of those lessons in only one subject were done with FCSD's BCBA from late September 2016 to late January 2017. Doc 40-8 at 710, 720. As the recording of the meeting and testimony prove, once again there was no discussion about IEP goals, objectives, related services (except to consider counseling sometime in the future), considerations of special factors, extended school year services, transitions goals and objectives, and other critical components that must be considered by the IEP team prior to even considering placement. Docs 40-2, P-6, 1/26/2017; 40-5 at 221, 224-225; 40-6 at 95. FCSD claimed in its January 26, 2017 IEP for I.S. that he was currently attending Eaton and his disability had no impact upon his academics, all of which was untrue. Doc 40-6 at 71 (same as August 2016 IEP (*id.* at 3)). FCSD unilaterally predetermined I.S. placement without preparation of an IEP. Doc 42, P-6, 1/26/2017. FCSD's psychologist who evaluated I.S. testified the IEP/IDEA process was not being provided and FCSD had undoubtedly predetermined placement. Docs 40-5 at 103, 105-106, 195-203. There was no real discussion about it – FCSD just allowed I.S.'s parents to talk and then Gilland would just reply with FCSD's same offer. *Id.* There was no give and take, and there was no data presented. *Id.* There was no real discussion, and there was nothing I.S.'s parents or the psychologist could say that

would change FCSD's placement. *Id.* Even when I.S.'s father offered to fly someone from FCSD to John Dewey to see the school, Gilland responded with what FCSD was going to do – continue behavior support. *Id.* at 201-202, 358. At the meeting, there were no discussions about different options for placements despite the fact that I.S. was not receiving what he needed. *Id.* at 255. Doc 42, P-6, 1/26/2017 (FCSD did not consider the continuum of placements as required).[6] FCSD had a plan before its employees went into the January 26, 2017 IEP meeting, and that was what the plan was going to be. Doc 40-5 at 282. FCSD did not take I.S.'s needs into consideration over its predetermined decision to place I.S. at home with 2 virtual courses, resulting in I.S. failing 11th grade and receiving no counseling or other related IDEA services. *Id.* FCSD wholly ignored I.S.'s parents' concerns about I.S.'s socialization needs and I.S. attending school and just kept saying what FCSD was going to do. Doc 40-5 at 737, 779. FCSD wholly dismissed I.S.'s parental request that FCSD consider a therapeutic residential school. *Id.*[7] To FCSD, a residential placement simply was not an option to even consider.[8] *Id.* at 737-738. At the IEP

---

[6] The LEA "must ensure that a continuum of placements is available to meet the needs of children with disabilities. 34 C.F.R. § 300.115(a). That continuum must include institutional placement. 34 C.F.R. § 300.115(b)(1).

[7] LEAs "must ensure that parents of each child with a disability are members of any group that makes decisions on the educational placement of their child." 34 C.F.R. § 300.327.

[8] "If placement in a public or private residential program is necessary to provide special education and related services to the child with a disability, the program,

meeting, FCSD did not invite anyone from John Dewey to attend, as it had predetermined the home placement with no meaningful special education and no related services.[9] FCSD said in the future it was either Eaton or some unnamed school, refusing to even consider a therapeutic residential educational placement. Docs 40-5 at 737-738; 40-6 at 95; 42, P-6, 1/26/2017.

I.S. began attending John Dewey on February 6, 2017. Doc 40-7 at 166. John Dewey is an accredited, therapeutic high school specializing in successfully educating gifted students with disabilities. Doc 40-5 at 578, 581, 587-588, 591. When I.S. started attending John Dewey, he was shut down and highly anxious, yet in that educational placement, he started attending a full load of high school classes and attending, at the least, 3 hours a week of individual therapy, daily group therapy, and family therapy. Docs 40-5 at 550-553, 590, 591; 40-7 at 166. At John Dewey, I.S. received 4 high school credits the second semester of the 2016-2017 school year. Doc 40-7 at 166. I.S. earned an A grade in 7 courses, including AP courses, and received a B+ in another. *Id.* I.S. even took some courses over the summer and received an additional 1.625 high school credits. *Id.* At John Dewey, I.S. not only

---

including non-medical care and room and board, must be at no cost to the parents of the child with a disability." 34 C.F.R. § 300.104.

[9] M.S. had asked FCSD to consider John Dewey at the November IEP meeting, but FCSD would not hear of it. FCSD knew it could not consider the John Dewey school placement at the January 2017 IEP meeting if it did not invite a representative of the school to attend the meeting. Doc 59-5 at 778. *See* 34 C.F.R. § 300.325(a)(2).

participated in rigorous academics, counseling, and therapy, he also undertook daily living responsibilities such as cooking, taking care of the facility, ordering food, and cleaning.  Doc 40-5 at 554.  At John Dewey, I.S. learned skills so that he could transfer to a traditional boarding school, including learning improved social skills, executive functioning skills, time management, organization, how to talk when it was difficult, how to manage his anxiety, and how to connect with others.  Id. at 598-599.  I.S. made friends at John Dewey, and his teachers reported he was an inspiration to all; he was a good, conscientious student who did very well academically; he was a precise and detailed writer; and he frequently earned perfect scores on tests and quizzes.  *Id.* at 597, 619-620.  While John Dewey is a therapeutic school, it is not meant to "cure" disabled students but to instead provide services, programming, and support so students can be successful in education, social interactions, and daily living skills.  *Id.* at 616-617.  The placement of I.S. at John Dewey cost I.S.' parents $73,097.71.  *Id.* at 740-743; Doc 40-7 at 128-159.

**Standard of Review** – Different standards of review control in this case.  This Court reviews *de novo* questions of law and reviews findings of fact for clear error.  *R.L. v. Miami-Dade Cnty. Sch. Bd.*, 757 F.3d 1173, 1181 (11th Cir. 2014).  However, when the district court's review is upon a cold IDEA administrative record, the Court "stand[s] in the same shoes as the district court in reviewing the administrative record and may, therefore, accept the conclusions of the ALJ and district court that

are supported by the record and reject those that are not." *Id.* (citing *Muscogee Cnty. Sch. Dist.*, 668 F.3d 1258, 1268 (11th Cir. 2012) (quotation marks omitted). Whether an educational program provided by a school system "provides an adequate education under the IDEA is a mixed question of law and fact subject to *de novo* review." *Id.* at 1182. Predetermination and placement questions are reviewed by the Court *de novo*. *Id.* at 1187. While due weight is given to the ALJ's factual decision, "the ALJ is not entitled to blind deference."[10] *Id.* at 1178. This Court's "standard of review [on] the district court's determination of the applicability of the attorney-client privilege is plenary." *Grand Jury Proceedings 99-9*, 889 F.2d 1039, 1042 (11th Cir. 1990). A district court's application of the crime-fraud exception to the attorney-client privilege is reviewed for an abuse of discretion. *In re Grand Jury (G.J. No. 87-03-A)*, 845 F.2d 896, 898 (11th Cir. 1988).

**Summary of the Argument** – The ALJ did not review the evidence of record but instead simply adopted FCSD's allegations proven false by the undisputed evidence in the IEP meeting recordings, yet the district court granted substantial to complete deference to the ALJ.[11] Doc 120 at 7. The issue before the Court include as follows.

---

[10] Due weight should be given to the factual determinations made during the administrative hearing process if "they are thoroughly and carefully made." *Cory D. v. Burke Cnty. Sch. Dist.*, 285 F.3d 1294, 1297-98 (11th Cir. 2002).

[11] Both the ALJ and district court reference the IEP recordings as undisputed facts, yet they assert facts proven false by those very recordings. *See, e.g.*, Docs 40-9 at 141, 163; 120 at 27.

1) The ALJ and district court both erred in finding no violation of I.S.' and his parents' IDEA procedural rights to a FAPE.  It is undisputed that at 4 consecutive IEP meetings, FCSD ignored and refused to provide the IDEA IEP process and FCSD told I.S.' parents FCSD was not going to alter I.S.' IEP.  The ALJ and district court also erred in finding there was no predetermination by FCSD, concluding FCSD determining placement without preparing an IEP was not a procedural violation, finding FCSD did not withhold critical educational records in violation of the IDEA, finding no procedural violation when FCSD did not provide I.S. a FBA and a BIP, and in ignoring FCSD's alteration of I.S.' psychological evaluation report to support FCSD's predetermined plan.  2) The ALJ erred in finding, without analysis, that statements made during a telephone call in which a school psychologist was told to destroy evidence and educational records, illegally prevent I.S.'s parents from learning in the future that FCSD was marking up I.S.' evaluation report for alteration, and what to omit and add regarding her psychological recommendations of I.S. was privileged attorney-client communications.  The district court erred in finding said communications were privileged and not waived and in not allowing supplementation as Judge May had ruled. 3) The ALJ and the district court erred in not applying the IDEA legal standard of substantive FAPE and thus denying appellants relief.  For example, both claimed the parties agreed there was minimal academic progress made by I.S. over more than a semester of high school, when in

fact, there was no progress, I.S.' parents did not agree there was progress (I.S. was failing all 6 high school courses), and even minimal progress would not have been legally sufficient.  The ALJ and district court ignored the undisputed evidence of record that FCSD refused to review and revise as needed I.S.' IEP to provide I.S. a FAPE and that I.S. was failing out of high school on the road to dropping out of school.  They ignored that I.S. had to have a consistent, rigorous, structured schedule to have any chance to make progress yet FCSD and its BCBA were the ones that refused to provide such a schedule. 4) The ALJ and district court erred in finding a home placement of I.S. the LRE or that Eaton was the placement (which I.S. could not access due to disabilities and which was only still in the IEP because FCSD refused to review and revise I.S.'s IEP).

**Argument**

The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).  The IDEA is also intended "to ensure that the rights of children with disabilities and parents of such children are protected." 20 U.S.C. § 1400(d)(1)(B). In determining whether a disabled child has been provided a FAPE, the courts first analyze whether the local educational agency ("LEA") complied with the IDEA

procedural requirements, and if so, it then determines if the IEP developed was calculated for the child to receive meaningful educational benefit. *Board of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 206-207 (1982). The IDEA mandates that children with disabilities be educated in the least restrictive environment ("LRE") appropriate. 20 U.S.C. § 1412(a)(5).

In this case, the ALJ ignored and mis-characterized key evidence, even blaming I.S.' parents for the scheduling issues when in fact it was FCSD and its BCBA who refused to commit to a schedule. The district court, however, gave basically unfettered deference to the ALJ's findings, and the court's decision proves it did so as to both the ALJ's inaccurate factual findings and its legal decisions, where no deference is due. Doc 120 at 18. This was prejudicial error as the ALJ's factual findings were not thorough, careful, or based upon credible evidence upon a review of the record. The ALJ's legal conclusions were in contravention of the IDEA and its mandates. For example,[12] the ALJ and district court claimed FCSD offered to provide I.S. a teacher at the September 2016 IEP meeting when in fact all that FCSD did was discuss maybe doing so in the future and FCSD never did so until January 26, 2017. Docs 42, P-6, 9/26/2016, 16:53-19:15, 40:20-44:00; 120 at 9; 40-9 at 6-7. The ALJ and district court also found that once again FCSD offered a teacher to

---

[12] While it is a daunting task, appellants ask this Court perform a *de novo* review of the administrative record, for if FCSD asserted something, the ALJ blindly adopted it, and the district court gave great deference to the ALJ.

the family in the December 2016 IEP meeting, yet what Gilland said was that she was not changing I.S.' IEP and would get back to the family about teacher options, but admitted at the hearing she never did. Docs 40-8 at 678-679; 42, P-6, 1:01:15-1:03:01, 1:05:00; 40-9 at 125; 120 at 11-12. The ALJ claimed the IEP meeting recordings from September until January 26, 2017 proved FCSD and I.S.' parents agreed the best course of action was to try to get I.S. back to Eaton, but that too is a mischaracterization of the evidence. Doc 40-9 at 141.[13] Instead, FCSD refused to alter I.S.' IEP until evaluation, Gilland told them she was not altering I.S.' IEP, and M.S. stated beginning in September 2016 if I.S. could not very quickly access Eaton, then they had to consider a residential placement adding that virtual (online education) at home was not appropriate. Doc 42, P-6, 9/26/2016, 6:30, 16:29, 18:13, 18:55. At the November 2016 meeting, M.S. said they either had to come up with a plan with goals and accommodations quickly or consider a backup, contingency plan

---

[13] The ALJ adopted this misleading factual argument from FCSD. Doc 40-9 at 28-29 (incredibly FCSD just cited to P-6 "*generally*."). Most of the ALJ's factual findings were from FCSD and clearly without record review, and the district court adopted many of them. Both FCSD and the ALJ cited to M.S. saying he had always wanted I.S. to graduate from Eaton, omitting from this 7 second snippet what else M.S. said which was basically that while that was his desire, the problem was I.S. could not access Eaton. Docs 40-9 at 15, 125. The ALJ adopted FCSD's argument and found J.S. admitted I.S. was making "progress" from October 2016 to January 2017, but that too was inaccurate. Instead, J.S. testified that I.S. had made some improvement. Docs 40-8 at 643; 40-9 at 126. A review of the record proves I.S. completed 4 lessons in October 2016 and by January 2017 had only completed 2 additional lessons. Docs 40-5 at 732; 40-6 at 44.

(three times he requested this). *Id.* at 39:50, 33:38; 1:03:57. At the December 2016 IEP meeting, M.S. said virtual at home and trying to get I.S. back to Eaton was not enough, and that they were not reaching the goal of getting I.S. back to Eaton. *Id.* at 12/21/2016 at 8:19; 10:16, 42:54. M.S. said they had to move forward, it was not working getting I.S. back to Eaton, and I.S. could not access Eaton mentally. *Id.* M.S. explained I.S. was rapidly approaching 18 and dropping out of school and shared John Dewey as a potential placement, and Gilland responded they had an IEP in place and she wasn't going to stop trying to get I.S. back to Eaton. *Id.* at 49:18-51:40. M.S. told FCSD I.S. required a lot of therapy and a highly structured environment to succeed and otherwise would not. *Id.* at 1:01;15-1:03:01. Gilland responded they still needed a psychological evaluation. *Id.* Three times her response to a residential placement was they had an IEP at Eaton (despite I.S. had been unable to access Eaton for 5 months and was failing). *Id.* at 52; 54:33 (Gilland said they were not changing anything on I.S.' IEP), 1:09:16. Also, parental written notice of private placement was given on January 11 **prior** to the January 26 IEP meeting. The ALJ and the court both asserted the parties agreed I.S. made minimal academic progress when the facts prove I.S. made no educational progress. Docs 40-9 at 128;[14] 120 at 13. I.S. completed in October 2016 without the BCBA's involvement 4

---

[14] The ALJ cited to the testimony of the school psychologist, but she testified I.S. was "not making any academic progress." Doc 40-5 at 192 (appellants cited this testimony in their post-hearing filing with the ALJ (*id.* at 4)).

lessons in one course, and when the BCBA was involved, 3 lessons in another course, and in all 6 courses, I.S. was failing out of school. Doc 113-1 at 14. The ALJ's clearly erroneous factual errors are rampant, and a *de novo* review should have been provided with no deference and is still required. *See M.C. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194 at n.1 (9th Cir. 2017) (The district court "must actually examine the record to determine whether it supports the ALJ's opinion.").

### A/B.[15] The District Court Erred in Finding FCSD Provided I.S. a FAPE Procedurally and Refusing to Supplement the Record

The IDEA "provides important procedural rights." *JSK v. Hendry County Sch. Bd.*, 941 F.2d 1563, 1565 (11th Cir. 1991). Procedural violations of the IDEA may result in a denial of FAPE when they 1) impede the child's right to a FAPE, 2) significantly impede the parents' opportunity to participate in the decision-making process, or 3) cause a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii). Important procedural rights include the right to access educational records *prior* to a hearing, the right to give informed consent,[16] the right to unilateral placement at public expense, the right to a fair hearing, and the right to participate in the decision-making process, including IEP preparation and placement decisions.

---

[15] These two issues should be considered together.
[16] 34 C.F.R. § 300.9(a) ("Consent means that the parent has been fully informed of all information relevant to the activity for which consent is sought ….").

20 U.S.C. §§ 1414(d)(1)(B), 1415(b), (d)(2), and (f)(3)(E); 34 C.F.R. § 300.613(a). The IDEA IEP is the "centerpiece" of the IDEA's delivery system. *Honing v. Doe*, 484 U.S. 305, 311 (1988). "The IEP is more than an exercise in public relations. It becomes the basis for a [disabled] child's entitlement to an education in conformance with the IEP …" *Georgia Assoc. of Retarded Citizens v. McDaniel*, 716 F.2d 1565, 1570 (11th Cir.), *cert. denied*, 469 U.S. 1228 (1983). Parents of disabled children play "a significant role" in the development of their child's IEP. *Schaffer v. Weast*, 546 U.S. 49, 53 (2005). "Procedural violations that interfere with parental participation in the IEP formulation process undermine the very essence of the IDEA." *Amanda J. v. Clark County School District,* 267 F.3d 877, 892 (9th Cir. 2001). The ALJ and district court erred in finding I.S.' parents were allowed to participate in the IEP process, it was not a procedural error for FCSD to not provide the IEP development process to I.S.'s parents, and it was not a procedural error to not provide a written IEP pursuant to that process. The undisputed evidence proves FCSD provided I.S.' parents no IEP process other than having meetings called "IEP meetings." The IDEA IEP procedural process requires LEAs review and revise a disabled child's IEP where there is a lack of progress on annual goals, a lack of progress in the general education curriculum, and to address the child's needs or parental concerns. 20 U.S.C. § 1414(d)(4). When reviewing and revising a disabled child's IEP, there is a detailed, important IDEA procedural

process, including IEP team consideration of many factors to be included in the child's IEP, such as how the child's current functioning impacts his involvement and progress in the general education curriculum and participation in appropriate activities; a statement of measurable annual goals, both academic and functional and how they will be measured; goals to meet the child's other educational needs; a statement of the special education, services, and supplementary aids to be provided; the date, frequency, location, and duration of services; appropriate post-secondary goals; communication needs, assistive technology, extended school year, and more. 20 U.S.C. § 1414(d)(1), (d)(3), (d)(4). In this case, FCSD went to 4 IEP meetings, never reviewed or revised I.S.'s IEP (except to add 6 hours of home services in January 2017), never reviewed progress on alleged IEP goals, admitted at the hearing I.S.' IEP goals were not being implemented the entire time, and repeatedly told I.S.' parents FCSD was not changing I.S.'s IEP. That clearly is an IDEA procedural violation completely denying I.S.'s parents' rights to participate in the decision making process  It is also the denial of a written educational program for I.S. as required.  In this case, the ALJ and district court found that FCSD not providing I.S.' parents the IEP process with written IEPs was not a procedural violation since there were recordings of meetings.  Docs 40-9 at

147; 120 at 27.[17] That is a direct violation of the IDEA, and what the recordings prove is that I.S.'s IEP was not reviewed and revised as required by the IDEA. There were no set hours for any services in any IEP until January 2017, all the while I.S. was failing and preparing to drop out of school.  Parents are totally deprived of their right to participate when the LEA will not even review and properly revise their child's IEP and when the LEA refuses to make any changes to a child's IEP when that IEP is not addressing the child's needs.[18]

---

[17] While this is completely antithetical to the IDEA, the irony of this is that the ALJ and district court both found the recordings, based upon FCSD argument, showed everyone agreed that getting I.S. back into Eaton was the right approach, despite M.S. telling FCSD back in September 2016 if they could not get I.S. back into Eaton quickly, a residential program would have to be considered and M.S. asking repeatedly for a back up plan and at the December 21, 2016 IEP meeting saying getting I.S. back to Eaton was not working and I.S. required a therapeutic, highly structured school and recommended John Dewey.

[18] The ALJ and district court somehow concluded FCSD's BCBA's unilaterally prepared goals in her report provided to I.S.'s parents in January 2017 were IEP goals. Docs 40-9 at 145; 120 at pp. 11-12, 18.  These were not IEP goals, the IEP team did not agree on them and place them in an IEP for I.S., the BCBA's report was not an IEP, and the BCBA testified her plan was evolving, she could change it at any time, and it could result in a goal of just asking I.S. to go to the parking lot of Eaton. The IEP is a written document, not a recording of an IEP meeting, and unlike the district court's and ALJ's legal conclusion, the purpose of a written IEP is not only to resolve disagreements about the IEP.  Instead, the written IEP forms the basis of the program, the services to be provided, and the placement as well as parents' rights to enforce the IEP. *See, e.g., M.C.,* 858 F.3d at 1197 (The written IEP informs parents "what services will be provided.").  In this case, Gilland testified FCD was not implementing I.S.'s IEP goals and objectives and not taking data on them.  Docs 40-5 at 192-194, 206-207, 216, 225; 40-8 at 399-400, 408-410, 429-430.  At no IEP meeting did FCSD discuss IEP goals and objectives.  Doc 42, P-6.

The district court and ALJ erred when they concluded FCSD did not predetermine placement. When, as here, there is nothing a parent can say that could change a school system's determination of IEP services or placement, the parents' "participation is no more than after the fact involvement." *Deal v. Hamilton County Bd. of Educ.*, 392 F.3d 840, 858 (6th Cir. 2004). When an LEA independently develops a proposed IEP with no consideration of alternatives, impermissible predetermination by the LEA is found to exist. *W.G. v. Board of Trustees of Target Range Sch. Dist. No. 23*, 960 F.2d 1479, 1484-1485 (9th Cir. 1992) (Merely conducting an IEP meeting is insufficient.). In this case, "no alternatives … were considered" by FCSD, and "the district assumed a 'take it or leave it' position at the meeting." *Id. See* 34 C.F.R. 300.116(a)(1) (LEAs "must ensure" "[t]he placement decision is made by a group of persons, including the parents . . ."). Both the FCSD psychologist[19] and I.S.'s father testified that at the January 26, 2017 IEP meeting FCSD just told I.S.'s parents what FCSD's plan was and would be and would not even consider any other placement options much less the continuum of placements, and the recording prove this.[20] M.S.'s proposal that a residential program be

---

[19] The court and ALJ looked at one snippet of FCSD's former psychologist's testimony, ignoring most of it.

[20] The district court stated that since the ALJ asserted appellants rejected all placement options other than a residential therapeutic school, that "implies that there were other offers made." Doc 120 at 20. Respectfully, there were no other offers made, and a *record review of the recording of that meeting proves this undisputed fact.* Doc 42, P-6, 1/26/2017. Added to this, the district court refused to review the

considered was ignored.  Doc 42, P-6, 1/26/2017.  *See* 34 C.F.R. 300.115(a), (b)(1) (the continuum of placements includes a residential program).  It is also undisputed FCSD did not once provide I.S.' parents the IEP development process, including at the January 26, 2017 IEP meeting.  None of the IEP considerations were considered but instead FCSD told I.S.'s parents what FCSD was going to do, not even engaging in the preparation of an IEP for I.S. The district court stated it was not clear how that impacted the predetermination decision.  Doc 120 at 20.  Appellants, however, had explained that "[p]redetermination violates the IDEA because the Act requires that the placement be based on the IEP, and not vice versa." *K.D. v. Dep't of Educ.*, 665 F.3d 1110, 1123 (6th Cir. 2011) (citations and quotations omitted) ("A school district violates the IDEA if it predetermines placement for a student before the IEP is developed . . . .").  This is because placement must be "based on the child's IEP."  34 C.F.R. § 300.116(b)(2).  "In order to base placement of a child on an IEP, the IEP must be fully developed." *R.L. v. Miami-Dade Cnty. Sch. Bd.*, 2008 WL 3833414 at

---

1/26/2017 IEP meeting recording, asserting the court had ruled that recording was privileged and inadmissible.  Doc 120 at 13 and n.2.  That was clear, prejudicial error, for the court found, without listening to the recording of the IEP meeting, there was no predetermination. The recording the court ruled was privileged was the one the FCSD psychologist made on January 25, 2017, when she was pressured and coerced into altering the psychological recommendations contained in her psychological report of I.S. Docs 73; 90 at 4, 12. The ALJ and the district court also ignored the testimony of four expert witnesses appellants presented at the hearing. Doc 40-9 at 112-167.

*26 (S.D. Fl. Aug. 12, 2008), *aff'*d, *R.L.* 757 F.3d at 1193. "If placement is determined prior to the development of the child's IEP, the placement could not have been based on the IEP, resulting in a fundamental violation of the IDEA." *Id. See also Spielberg v. Henrico Cnty Pub. Schs.*, 853 F.2d 256, 259 (4th Cir. 1988) (same). It is undisputed that FCSD did not prepare an IEP for I.S. but instead merely told I.S.' parents its plan and what it was going to do and added it into the services page of its January 26, 2016 IEP. In this case, FCSD came into every IEP meeting with closed minds, telling I.S.' parents the IEP would not be changed, despite continued concerns about the lack of progress, the original desire to get I.S. back to Eaton not working, scheduling issues, and I.S.'s need for a residential therapeutic educational program with counseling, socialization, and a highly structured setting.

The ALJ and district court erred in finding there was no predetermination because FCSD scheduled IEP meetings, FCSD allowed the family to record the meetings, I.S.'s parents attended the meetings, I.S.' parents agreed to trying to get I.S. back to Eaton, and they were allowed to talk. None of this equates legally to meaningful parental participation or that FCSD did not predetermine its segregated home placement with almost no supports (if it did, there would be no IDEA right to parental participation). The school psychologist had been employed by FCSD for 16 years and was qualified as an expert witness in school psychology. Doc 59-4 at 606, 611. She testified that it was clear the placement was predetermined, no

consideration at all was given to any other placements or plans, no goals were considered (they drive placement), no IDEA IEP process was provided, and no give and take was allowed at all, and the recording proves this.  Docs 40-5 at 103, 105-106, 107, 195-123, 201, 224-225; 42, P-6, 1/26/2017.  The ALJ and district court, citing the recordings, also claimed that at every meeting until January 26, 2017, I.S.'s parents agreed to getting I.S. back to Eaton.   The recordings disprove this, as set forth above.  *See also* Doc 40-5 at 561 (FCSD's BCBA admitted that at every meeting I.S.'s parent(s) stated their significant concerns about I.S. not being in school and not having socialization, the urgency to move rapidly, and more.).

As to the issue of record supplementation and district court rulings on alleged attorney-client privilege (Docs 93, 107),  the ALJ erred in not allowing into evidence or considering what was in evidence regarding Gilland, Barrow, and FCSD's lawyer telling FCSD's school psychologist what psychological recommendations to add and delete from her evaluation report.  *See* Docs 17, 17-5 (original is public record); 40-9 at 143 (It was in evidence in the record that at the January 25, 2017 phone call, FCSD's psychologist evaluating I.S. was pressured and coerced into altering her psychological recommendations the day prior to I.S.' IEP meeting.).   The ALJ disallowed the evidence of the conversation regarding psychological recommendations to be deleted and added yet claimed in his final decision, without citation, that during that call it was "perfectly reasonable for FCSD to discuss and

prepare for the possibility of a hearing, without having predetermined I.S.'s placement."). 52-1 at 377-381. When the issue was before the district court, Judge May, without ruling on whether a discussion about psychological recommendations is legal advice or not, found FCSD waived those discussions when it asserted in its answer those recommendations conveyed to the school psychologist were merely "nonsubstantive" in its answer. Docs 38 at ¶¶ 54, 55; 93 at 8-12.[21] Appellants did not assert whether the recommended alterations were substantive or nonsubstantive, just alleging recommendations were made. Judge May found FCSD interjected into the case a specific issue that implicated the conversations, citing to this Court's decision in *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386 (11th Cir. 1994). Doc 93 at 9-10. The district court, after a third judge was assigned the case, however, reversed this decision and found there was no waiver. Doc 107 at 12. The court erred in doing so, saying FCSD' affirmative assertion that its recommendations were not substantive could have been based upon documents. *Id.* The issues with that are that FCSD asserted that FCSD employees "offered" during the phone call only

---

[21] Although FCSD, Barrow, Gilland, and FCSD's attorneys denied they discussed any changes regarding I.S.' psychological report prior to and throughout the IDEA hearing, they finally "conceded that 'the participants on the [January 25, 2017] call discussed revisions of the report.'" Doc 93 at 11. *See also* Doc 59-3 at 412 (Gilland testified under oath FCSD's attorney merely gave "guidance, to make sure that [they] were in compliance with the requirements of the IDEA" when in fact FCSD later admitted those present at the meeting told the school psychologist how to alter her psychological recommendations contained in I.S.' psychological evaluation report.)

"nonsubstantive edits." Doc 38 at ¶¶ 54, 55. The documents in no way show all that was discussed and what the school psychologist was told to change and why, which all goes to whether the offered changes were substantive or nonsubstantive. The district court cited *U.S v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991), involving inapposite facts not applicable to this case. Doc 107 at 9; Doc 102 at 15-16. The court also relied on the decision in *Lorenz v. Valley Forge Ins. Co.*, 815 F.2d 1095 (7th Cir. 1987). Reliance on that decision was error as well, for as the court explained in *Lorenz*, the defendant did make any assertion about the communication but merely presented post-filing offers it had made, not claiming good faith. Id. at 1098. The district court, after the third transfer of the case, ignored the supplemental evidence allowed by Judge May in ruling on the motions for judgment on the record. Doc 120 at 21. *See, also*, *e.g.,* Docs 69-4 at 18; 93 at 21 (Judge May found relevant and allowed supplementation FCSD's discovery admission that it never told I.S.' parents of the psychological report alterations and alleged that Gilland and Hammond merely forgot they told the school psychologist the changes to be made to her report, after having adamantly denied this.). The other privilege issues to be addressed upon appeal include: **1)** Given the court's ruling, Judge May did not analyze whether FCSD interjected into the case that the school psychologist "voluntarily accepted" the recommended alterations of her psychological recommendations and whether the report was only a rough draft, both of which the

recording disproves.  Doc 93 at 12, n.5.  Those claims should have been ruled upon

on the motions for reconsideration, and they establish waiver. **2)** Judge May ruled

the crime-fraud exception did not apply to FCSD's attorney's advice to destroy

records and evidence when litigation was pending because FCSD argued it was

merely a statement about what must be produced and not produced.  The issue with

that is it clearly misstates the advice.  Docs 86-1 at 12; 93 at 15. **3)** Judge May ruled

that FCSD's attorney telling employees to merely copy her on emails to wrongfully

ensure marked up drafts never get to I.S.' parents in violation of GORA and other

laws did not fit into the crime-fraud exception because FCSD allegedly never

asserted attorney-privilege.  Doc 93 at 16-17.  FCSD, however, asserted attorney-

client privilege from the very beginning and then withheld the marked up

psychological evaluation for 7 months until threat of litigation, yet it withheld the

email sending that marked up report until after the pre-hearing on March 1, 2019.

Docs 99 at 5-10; 40-4 at 1 ("Subject:  Confidential and Privileged").  **3)** The court

also erred in finding FCSD could not have intended to violate the open records act

by withholding records or making them difficult to obtain as a GORA request had

not yet been filed, and this was maintained on reconsideration.  Docs 93 at 17; 107

at 14.  The issue here was that FCSD knew if it did not falsely assert the privilege,

the family would later request and obtain the records.  Doc 99 at 2-12.  It was not

highly speculative that the plan was to ensure in the future I.S.' father, an attorney

who had made prior GORA requests to obtain his disabled child's education records, would file another GORA request after FCSD demanded I.S. be educated in the home with a few hours of education. *Id.*; Doc 107 at 14. *See also* O.C.G.A. § 50-18-74. At the least, an *in camera* review should have been conducted based upon the evidence as the allegation of a plan to commit a crime in the future had "some foundation in fact. " *In re Grand Jury Subpoena*, 2 F.4th 1339, 1345 (11th Cir. 2021). In this case, M.S. had made prior GORA requests, FCSD did not want I.S' parents to learn that FCSD was passing around marked up psychological reports of I.S., and FCSD knew if it did not allegedly privilege those communications by merely copying a lawyer on the emails passing them around, the family would obtain them. That is not speculative. Added to this, FCSD did in fact withhold the very documents it did not want appellants to receive, after having claimed on the email it was privileged. **4)** It was an abuse of discretion for the court to find two FCSD administrators and an attorney telling a psychologist what psychological recommendations to put in and delete from her psychological evaluation report of I.S. was not a violation of the Georgia statute prohibiting non-psychologists from practicing psychology. *See* O.C.G.A. § 43-39-1(3) (The practice of psychology includes, *inter alia*, the provision of services to treat mental disorders, to render opinions about mental disorders, and to provide psychological guidance.); O.C.G.A. § 43-39-7 (It is a crime to practice psychology without a license.). The court stated

that the discussion involved "the treatment of behavioral disorders," and treatment of behavioral disorders is the practice of psychology, especially when it involves psychological recommendations contained in a psychological evaluation report signed by a licensed psychologist. **5)** On the motion for reconsideration, the court erred when it found the discussions about psychological recommendations "appeared to be legal advice." Psychological recommendations are not legal advice, and if they were, then that advice would be to commit a fraud. The court stated that appellants had not defined what constituted psychological advice, but they had in their second motion to supplement. Docs 86-1 at 17. The court also stated appellants had not parsed out the psychological advice, but they had generally - psychological recommendations in a formal psychological evaluation report - and explicitly - the recommendation I.S. continue to receive behavioral support services. Docs 88-1 at 14; 105 at 6. The court concluded that the record showed the main purpose of the call was to allow legal advice in anticipation of litigation. Doc 107 at 17. There is no foundation for that, and FCSD's attorney, however, testified under oath that at the time of the call on January 25, 2017 she did not anticipate litigation. Doc 40-4 at 232. Discussions about psychological recommendations to be added to and deleted from a psychological report simply are not legal advice, and the court itself found the discussions to be about the treatment of behavioral disorders. This issue is raised within the procedural violation section because it goes to a denial of the IDEA

procedural rights of parent participation and the right to give informed consent. Gilland insisted FCSD evaluate I.S. prior to ever changing I.S.'s IEP. Gilland claimed the evaluation was required so they could "make really informed decisions." Doc 40-8 at 346. Then, the day prior to the IEP meeting Gilland met with Barrow, the school psychologist, and an attorney, and they pressured the school psychologist to add to her psychological recommendations a recommendation that I.S. continue to receive behavioral support despite the psychologist saying she did not have sufficient information to include that recommendation. Doc 17-5 at 9 (public record since March 14, 2019). Gilland is the director of special education for FCSD and she well knows that the IDEA mandates that the IEP team must consider the most recent evaluation. Doc 40-4 at 43. *See also* 20 U.S.C. § 1414(d)(3)(A)(iii). At the IEP meeting, FCSD presented to I.S.' parents what FCSD asserted to be the psychologists' psychological recommendations, not disclosing non-psychologists and an attorney had been involved in altering that evaluation report of their child. Doc 42, P-6, 1/26/2017 at 1:13:00. After this, when M.S. asks for feedback regarding I.S. being placed at John Dewey, Gilland says FCSD wants to continue with the schedule (ironically, there was not one), meaning with FCSD' BCBA, adding that is where FCSD is. *Id.* at 2:34:10. Any reasonable person would conclude that Gilland insisting the psychologist alter her report to include what was insisted upon the next day in an IEP meeting goes to predetermination, especially when one considers how

vehemently Gilland and Barrow denied, even under oath, having any input into that report.  Docs 69-4 at 18; 93 at 21.  M.S. also had the right to give informed consent when Gilland asked him to consent to the psychological evaluation, and that meant he had to be fully informed of all the information relevant to the activity.  34 C.F.R. § 300.9(a).  This did not happen because he was not told an attorney and Gilland were going to pressure the school psychologist to alter her report.

The district court and ALJ erred in finding it was not a violation by FCSD of I.S.' and his parents' procedural rights for FCSD to not provide the FBA and BIP FCSD agreed to provide.  I.S.' parents relied on this evaluation being completed and the resulting plan to be provided, and M.S. asked where was the solid behavioral plan at the November 2016 IEP meeting but was never provided one.  Docs 40-5 at 141-142, 147, 385, 415, 450-451, 449, 534; 40-7 at 112; Doc 40-8 at 405-406. Parents cannot be told an FBA and BIP will be provided, rely on this, make decisions on this, and the LEA then not provide the evaluation and BIP and not tell the parents of that decision.  *See*  20 U.S.C. § 1415(b)(3) and (c) (LEAs must provide prior written notice when they refuse, *inter alia*, to undertake an evaluation).  The failure to provide the FBA and BIP also caused a deprivation of educational benefits to I.S.  *See* 20 U.S.C. § 1415(f)(3)(E).  FCSD's BCBA testified it is important to know the function of a child not attending school and to then prepare a function-based treatment plan but that she did not assess the function of I.S.' behavior (the

purposes of an FBA) and did not know what the function was because she never evaluated it.  Doc 40-8 at 543-546.  The district court abused its discretion in concluding that FCSD not informing I.S.' parents it was not conducting an FBA and providing a BIP based upon the FBA was not a procedural violation of significance because I.S.' parents were "on board" with the BCBA's plan until the January 2017 IEP meeting.  First, as set forth above, that is a misstatement of the undisputed evidence.  I.S.' parents were in agreement with getting I.S. back to Eaton, if that could happen without delay, but if it could not happen rapidly, then they knew from I.S.' past educational history, I.S. would require a therapeutic, residential, highly structured school, as that had worked in the past. Regardless, however, the entire time M.S. thought that part of the alleged plan was to provide the FBA and from that a solid behavioral plan.  He was never informed that was not going to be in the "plan."

The ALJ and district court also erred when they concluded appellant's IDEA procedural safeguards to receive all of I.S.'s educational records *prior* to the hearing and their right to a fair hearing were not denied to them amounting to a denial of FAPE procedurally.  It is undisputed that FCSD and its BCBA withheld critical educational records including their scheduling logs, I.S.' and M.S.' right to confidentiality with the BCBA, communications between the BCBA and Gilland, and more, as set forth in affidavits.  *See, e.g*., Doc 115-4 at 24-77.  This

denied I.S.' parents to be informed, to make informed decisions, and to prepare for and participate in a fair hearing. *See* 34 C.F.R. § 300.613(a)[22] The ALJ and district court erred when they found I.S.' educational records were only requested pursuant to the open records act and FERPA. The undisputed evidence of record was M.S. requested his child's educational records as well pursuant to the IDEA, and they raised this issue in this case. *See, e.g.,* Docs 52-1 at 289, 294, 296, 302; 93 at 23-34 (Judge May recognized this.). FCSD's withholding of important educational records deprived M.S., an attorney, his right to prepare for and participate in a fair hearing process with necessary information from his child's education records.

---

[22] FCSD's BCBA withheld a copy of her contract she had J.S. sign, so M.S. did not know I.S. and he had a right to confidentiality. Doc 115-4 at 1-4, 6-13. When he received the record after the hearing began and conferred with Dr. Mueller, he learned of this right and that the BCBA was going to do parts of an FBA, which was not agreed upon. This denied M.S. necessary information. When M.S. finally was provided this educational record *after the hearing had begun*, he instructed his attorney to invoke I.S.' and his right to confidentiality, as he could not have waived the right because he did not know it to exist. This led to the ALJ delaying the hearing for 4 months and imposing a civil fine upon Plaintiffs' counsel $150 because *M.S. and counsel should have known* of the confidentiality right and should have made a reasonable inquiry, despite M.S. having asked repeated times for more than a year for all I.S.' educational records. Doc 59-5 at 287-289. That was reversible error as well, as it was based upon the withholding of educational records in violation of the IDEA. The district court said it declined to exercise jurisdiction over the issue as it agreed with the ALJ, not addressing the issue of the educational record having been improperly withheld in violation of the IDEA.

**C. The District Court Erred in Finding FCSD Provided I.S. a FAPE Substantively**

The IDEA "defines a 'free appropriate public education' pursuant to an IEP to be an educational instruction 'specially designed ... to meet the unique needs of a child with a disability,' § 1401(29), coupled with any additional 'related services' that are required ...." *Winkelman v. Parma City Sch. Dist.,* 550 U.S. 516, 524 (2007). The term "related services" includes, *inter alia*, psychological services, therapy, recreation, social work services, counseling services, parent training and counseling, "as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26)(A); 34 C.F.R. § 300.34(c). FCSD did not even consider, much less provide I.S. any related services and stated in its IEPs that I.S. did not require related services. Doc 40-6 at 35, 95.

The FAPE "meaningful educational benefit" "standard is markedly more demanding than the 'merely more than *de minimis'* test ...." *Endrew F. v. Douglas Cnty. Sch. Dist.*, 137 S.Ct. 988, 1000 (2017). The educational benefit provided to children with disabilities "'cannot be a mere modicum or de minimis; rather, an IEP must be likely to produce progress, not regression or trivial educational advancement.'..." *R.H. v. Plano Indep. Sch. Dist.*, 607 F.3d 1003, 1008 (5th Cir. 2010). "Clearly, Congress did not intend that a school system could discharge its duty under the [IDEA] by providing a program that produces some minimal academic advancement, no matter how trivial." *Hall v. Vance Cnty. Bd. of Educ.*, 774

F.2d 629, 636 (4th Cir. 1985). It is unquestionable that FCSD's inappropriate September 2016 IEP (that FCSD admitted it did not implement yet it refused to alter) was not designed to result in progress once I.S.' needs changed due to disability. With that IEP, I.S. was failing, yet FCSD and the BCBA refused to commit to a schedule and refused to put the behavioral services to be provided in I.S.'s IEP, and the result was FCSD's BCBA met 3 times with I.S. from September to November 2016. Doc 42, P-6, 11/11/2016, 2:40. As to I.S.' goals and objectives, they were not implemented and no data was taken. Doc 40-8 at 399-400, 408-410, 429-430. FCSD's January 2017 IEP with its segregated, restrictive home placement without preparation of an IEP was to provide I.S., if there were no scheduling issues, only 2 hours a week of "behavioral services" and 4 hours a week of instruction in only 2 courses out of 6. Doc 40-6 at 95. That predetermined, unilaterally placement decision outside the IEP process was on its face not designed to result in meaningful progress, especially considering I.S.'s capabilities and the fact FCSD would not even set a schedule for 2 hours a week so 6 hours was implausible.

"A focus on the particular child is at the core of the IDEA." *Endrew F.*, 137 S.Ct. at 999. At the relevant time, I.S. required an education in a highly structured, therapeutic school setting that provided, at the least, the related services of counseling and therapy, social skills training and supports, daily living skills

instruction, socialization opportunities, and access to a full academic curriculum. Doc 40-5 at 152-153, 189-190.

FCSD itself admitted that I.S.'s greatest needs were to learn socialization, attend school, and complete assignments, yet its IEP for I.S. in November 2017 and the one in January 2017 were not designed to do anything but relegate I.S. to home with no social skills services, no counseling, no social interaction, and a few hours a week home services and maybe 2 hours a week of behavioral consultation. Docs 59-7 at 482. *See* Doc 58-9 at 79-121 *(Community Consolidated Sch. Dist. # 93 v. John F.*, N.D.Ill. October 19, 2000, Case No. 00 CV 1437, 31-33 (The LEA denied the disabled child a FAPE because the home placement did not address his social and emotional needs.)). FCSD did not even amend I.S.' IEP objectives it was not implementing. Dc 40-6 at 13, 31, 87.

The ALJ, *inter alia*, ignored FCSD's home placement, saying Eaton was proper and home was only temporary. First, Eaton's director testified Eaton was not able to meet I.S.'s needs and I.S. required a residential placement. Doc 40-5 at 127-128, 180. Second, I.S. had been at home for over 5 months of a 9 month school year, and FCSD and its BCBA had not even asked I.S. to go to Eaton by February 2017. That was not temporary. I.S.' parents did not have to continue to allow I.S. to fail and prepare to drop out in just a few months. The IDEA FAPE nor LRE mandates do not require that of parents.

42

FCSD simply cannot defend its IEP when it refused to address I.S.'s disabilities that so negatively impacted his education. *See* 20 U.S.C. § 1414(d)(1)(A)(i)(II) (aa) and (bb). At the hearing, FCSD admitted I.S.'s critical educational needs, yet FCSD ignored them in its IEPs for I.S. Docs 40-5 at 141, 161-162, 196-197, 220, 569; 40-6 at 26, 596, 602; 40-8 at 719. The ALJ and district court claimed services were offered but rejected. First, the recordings prove otherwise. Second, the duty was on FCSD to put whatever its alleged program and services to be provided were in its IEP for I.S. and then provide them. Third, the court says the ALJ found FCSD offered "a full psychological evaluation." Doc 120-25. I.S.' parents did not reject that, but it was not helpful, and it was fraudulent as Gilland and an attorney had it altered. A teacher was discussed for some time in the future but FCSD did not put that in an IEP until January 2017, when home education was not appropriate for I.S. The ALJ also claimed FCSD arranged for I.S. to do virtual at home. I.S. could access virtual, which was supposed to be in the Eaton mentor room, from home before the BCBA ever got online. Doc 40-8 at 582. In addressing substantive FAPE, the ALJ and district court once again conflate the BCBA "plan" that was evolving and subject to unilateral change at any time outside the IEP process with I.S.' IEP. The IEP objectives, even as of January 2017, were not being implemented and were never reviewed and revised. As to the BCBA's 2 non-IEP goals, she testified she would ask I.S. to go to Eaton, and if did not work,

observe, alter the "plan," and ask for less, like I.S. going to the parking lot of Eaton. That is not educational plan for I.S., not an IEP, and certainly not designed for progress, as I.S. was failing out of high school.  Again, the court erred when it found FCSD did not have to provide I.S. written IEPs since there were meeting recordings. That is exactly what the IDEA prohibits by mandating a written document that addresses a multitude of important considerations set forth in the IDEA.  20 U.S.C. § 1414(d); *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1526 (9th Cir. 1994) (LEAs must make a formal, written offer of FAPE in an IEP and not just argue what it proposed to do or might do.). I.S. was failing out of high school, at home, receiving less than de minimis services, "sitting idly … awaiting the time when [he] was old enough to drop out." *Rowley*, 458 U.S. at 179 (quotation and citation omitted).  That was not an appropriate education designed to result in progress in light of I.S. abilities.

The ALJ erred when it adopted FCSD's legal argument that in this case, because I.S.'s disabilities prevented him from accessing Eaton, it was I.S.'s fault, citing to *L.J. v. School Bd. of Broward Cnty.*, 927 F.3d 1208 (11th Cir. 2019).  The decision in *L.J.* is inapposite to this matter, for *L.J.* solely involved an IEP implementation issue.  On appeal, FCSD dropped this meritless legal argument, and the district court did not adopt it.

Regarding reimbursement under the IDEA for I.S.' parents having to pay for private placement, '[w]hen a public school system ha[s] defaulted on its obligations

under the [IDEA], a private school placement is 'proper under the Act' if the education provided by the private school is 'reasonably calculated to enable the child to receive educational benefit.'" *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 11 (1993) (quoting *Rowley* at 207).  A private placement does not have to be perfect, and the IDEA's least restrictive environment requirement does not apply to private school placements.  *R.L.,* 757 F.3d at 1184, 1191 n. 10.  In this case, John Dewey was researched by I.S.'s parents, introduced to FCSD in two IEP meetings, and was very much reasonably calculated to enable I.S. to receive educational benefit, and it is undisputed it did so.  Doc 40-5 at 554, 598-599, 616-617, 619-620; Doc 40-7 at 166.  The district court did not consider reimbursement because it erred in finding FCSD provided I.S. a FAPE procedurally and substantively in the LRE.

### D.    The District Court Erred in Finding FCSD Provided I.S. an Education in the LRE

The denial of a placement in the LRE is a denial of a FAPE.  *See, e.g., Brown v. Dist. of Columbia*, 179 F.Supp.3d 15, 24 (D. D.C. 2016) (the lack of discussion about the LRE and the type of placement the student needed along the continuum of alternative placements denied the student a FAPE).  "In selecting the LRE, consideration [must be] given to any potential harmful effect on the child or on the quality of services that he or she needs." 34 C.F.R. § 300.116(d).  As FCSD itself admitted, 1) a home placement is a "highly restrictive" setting, 2) I.S. needed to be at school, and 3) I.S. had to learn important social skills.  Doc 40-8 at 385, 671, 677.

FCSD's predetermined home placement with only a few hours a week of tutoring in only 2 classes and 2 hours a week of "behavioral services" that were ineffective in getting I.S. to a day school could not have been much more restrictive. FCSD knew I.S. could not, because of his disabilities, access Eaton, that Eaton could not meet his needs at that time, and I.S. was failing out of high school and waiting to drop out of school. That FCSD did not alter I.S.' IEP to meet his needs does not change the fact FCSD knew I.S. could not access that placement and was not doing so, such that any comparison of Eaton to an effective residential school is meaningless. As to the January 26, 2017 IEP, FCSD did place I.S. at home on virtual in 2 classes. That is a highly restrictive, harmful placement for a student with I.S.' disabilities, and it is without meaningful benefit. FCSD had four months to integrate I.S. back into Eaton and the result was complete lack of progress. FCSD had not even asked I.S. to go to Eaton as of the time I.S. started John Dewey Academy and was attending a full load of academic classes and receiving critical social skills supports, counseling, and therapy.

## Conclusion

For the foregoing reasons, appellants ask this Court reverse upon *de novo* review the district court's findings that appellee provided I.S. a FAPE procedurally and substantively in the LRE, reverse the finding that the communications at issue were privileged, reverse the ALJ's finding that M.S. and his counsel should have

known of the BCBA's ethical requirements or made reasonable inquiry when they

sought diligently I.S.' educational records that would have disclosed that

information, and award appellants judgment in the amount of $73,097.71 for the

costs I.S.' parents had to pay for I.S. to attend John Dewey.  Alternatively, appellants

request this Court remand the matter for a full record review.

Respectfully submitted the 19th day of January 2024.

*/s/ Chris E. Vance*

Chris E. Vance, GA Bar 724199

Attorney for Appellants

**Chris E. Vance, P.C.**

Suite 100, 2415 Oak Grove Valley Road NE

Atlanta, GA  30345

(404) 320-6672

chris@chrisvancepc.com

## <u>CERTIFICATE OF COMPLIANCE</u>

Counsel for appellants certifies that this brief complies with the type-volume limit, typeface requirements, and type-style requirements as follows:

1) This document complies with the word limit of Fed.R.App.P. 27(d)(2) because appellants' opening brief contains 12,906 words.

2) This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6).

## <u>CERTIFICATE OF SERVICE</u>

Counsel for appellants certified that this brief has been served this day upon counsel for appellee.

Respectfully filed this 19th day of January 2024.

 */s/ Chris E. Vance*

Chris E. Vance, Ga. Bar No. 724199

Counsel for Appellants

**CHRIS E. VANCE, P.C.**

Suite 100, 2415 Oak Grove Valley Road

Atlanta, GA 30345

Tel:  (404) 320-6672